**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION**

| | |
|---|---|
| JOHN D. BARGER, | |
| Plaintiff, | No. 3:06-cv-0066-JAJ |
| vs. | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | **ORDER** |
| Defendant. | |

This matter comes before the court pursuant to briefs on the merits of this application for disability insurance benefits. This court finds that the decision of the Social Security Administration is supported by substantial evidence. This case is dismissed.

## I.  PROCEDURAL BACKGROUND

Plaintiff John Barger (hereinafter "Barger") filed an application for Disability Insurance Benefits on September 18, 2003, alleging an inability to work since April 30, 2002 (Tr. 53-55).[1]   The Social Security Administration ("SSA") denied Barger's application initially and again upon reconsideration (Tr. 30-34, 39-42).   Administrative Law Judge ("ALJ") Ralph L. Wampler conducted a hearing on Barger's claim on November 16, 2005 (Tr. 24).   The ALJ denied Barger's appeal on January 12, 2006 (Tr. 23).   Barger filed this action for judicial review on January 30, 2006 (Tr. 10-11).   The Appeals Council denied his request for review on June 2, 2006 (Tr. 6-8).   Barger filed this action for judicial review on June 19, 2006 (docket number 1).

---

[1]Barger initially alleged an onset date of October 28, 2001.  He amended the onset date at his November 16, 2005 hearing (Tr. 422).

## II.  FACTUAL BACKGROUND

At the time of the hearing, Barger was forty-one years-old.  He was thirty-seven at the time of his alleged disability onset date.  At the time of his application, Barger had completed twelfth  grade.  Since that time, he has completed two associates degrees.  His vocationally relevant work experience includes work as a restaurant manager, bus driver, and truck driver.

### A.  Relevant Medical History

Barger alleges disability due to lower back pain stemming from a fall at Applebee's Family Restaurant, his employer, on October 31, 2001.  The record reflects that Barger received numerous treatments for lumbar spondylosis, degenerative disk disease, annular tearing and discogenic pain, high blood pressure, and gastrointestinal problems.  On January 8, 2002, Barger received an epidural steroid injection from Dr. Timothy Miller at the Mississippi Valley Surgery Center (Tr. 151).  Dr. Miller determined that Barger had "three level annular tearing with degenerative disc changes at L3-4, 4-5 and 5-1" (Tr. 151).  On January 29, 2002, Barger received a second epidural (Tr. 150).  Dr. Miller stated that "[a]t this point he really has gotten to a pretty good position," finding that he had done well with epidurals and physical therapy (Tr. 150).  Dr. Miller estimated that Barger's pain had reduced by about sixty percent and could return to work at Applebee's (Tr. 150).

On February 28, 2002, Barger saw Dr. Dooley, an associate of Dr. Miller's, for a follow-up to his January 29 epidural (Tr. 148).  Dr. Dooley's notes indicate that he was complaining of low back pain and bilateral leg radiation (Tr 148).  "His pain is provoked by mechanical movements such as flexion/extension, prolonged standing or walking" (Tr. 148).  Barger had returned to work at this point (Tr. 148).  Dr. Dooley assigned a work restriction of less than fifteen pounds lifting, no repetitive twisting and bending, and no

ladder climbing (Tr. 148).  He also prescribed a third epidural steroid injection (Tr. 148), which was performed that day (Tr. 149).

On March 14, 2002, Barger returned to Dr. Miller with recurring complaints of back pain (Tr. 147).  Dr. Miller prescribed Ultracet to use during the day and wanted to explore therapy (Tr. 147).  He stated that the "epidurals have probably not been as effective as we had hoped" (Tr. 147).

On March 27, 2002, Barger presented himself to Dr. Miller with worsening pain (Tr. 146).  Dr. Miller stated that he needs to reassess Barger's options such as surgery or Intradiscal Electrothermal Annuloplasty (IDET) (Tr. 146).  He prescribed hydrocodone, ibuprofen, and amitriptyline for sleeping (Tr. 146).

On April 12, 2002, Dr. Miller performed a diagnostic discography on Barger, which revealed three-level degenerative discs (Tr. 145).  He determined that Barger is not a candidate for IDET and suggested a long-term pain medication such as OxyContin (Tr. 145).

On April 30, 2002, Barger had a follow-up appointment with Dr. Miller who stated that unless surgery was an option, Barger was "as good as he was going to get" (Tr. 144).  Dr. Miller noted had spoken with Barger's workers' compensation caseworker, Bonnie Barr, who had decided that Barger could no longer work because he was "not serving a useful enough purpose" (Tr. 144).

On June 6, 2002, Barger saw Dr. Ernest Found at the University of Iowa Hospitals and Clinics ("UIHC") to discuss surgical options (Tr. 366).  Dr. Found evaluated his functional ability and found that he could not walk, stand or sit for more than ten minutes (Tr. 367).  Dr. Found determined that he was not a candidate for surgery, but believed that a "multidisciplinary rehab program could help him return to 80-90% of his previous function" (Tr. 368).  Dr. Found also ordered an L-Spine Exam which revealed "mild disk

space narrowing" and a "small osteophyt in the anterior and superior aspect of L4 body," findings consistent with Spondylosis (Tr. 370).

On July 5, 2002, Barger returned to Dr. Miller for a follow-up (Tr. 142). Dr. Miller concluded that Barger "is at maximum medical improvement" (Tr. 142). He recommended a new functional capacity evaluation, anticipating that it will be "somewhere between a sedentary and light duty classification" (Tr. 142). He determined that Barger had a Class 2 impairment on the AMA Guides, with a five to eight percent impairment (Tr. 142).

On November 21, 2002, Barger saw Dr. Lenz about his chronic low back pain (Tr. 208). Dr. Lenz noted that "99% of his low back . . . is very tender to palpation especially over the posterior spine" (Tr. 208). He found that Barger "really hasn't improved much over this 11 month period" (Tr. 208). Dr. Lenz ordered a Magnetic Resonance Imaging ("MRI") scan to further identify Barger's source of pain (Tr. 208).

On January 21, 2003, radiologist Dr. Joseph Phelan, M.D., performed an MRI of Barger's lumbar spine (Tr. 209). Dr. Phalan found that Barger had disc degeneration at the lowest three lumbar levels, L3-4, L4-5, and L5-S1, as well as degenerative facet changes (Tr. 209). Dr. Phelan also found disc degeneration and small disc bulges, but "no evidence of any lateralized or herniated, or migrated disc material" (Tr. 209).

On February 26, 2003 Barger saw Dr. Kevin Wilson, D.O. at the Pain Clinic (Tr. 187). A physical examination revealed that Barger had decreased motion and a "very rigid posture" (Tr. 187). He also found that Barger had pain bending forward "but worse pain with return to the upright position" (Tr. 187). The "majority of his pain [is] with extension and rotational movements" (Tr. 187). Dr. Wilson reviewed his MRI which showed degenerative disc changes and possible annular tears (Tr. 188). Dr. Wilson also found that he had "deformity of his left facet joint at L5-S1" and facet arthropathy at L4-L5 and L5-S1 (Tr. 188). Dr. Wilson concluded that he had lumbar spondylosis with

4

degenerative disk disease (Tr. 188).  He recommended that Barger proceed with diagnostic bilateral lumber facet blocks and radiofrequency facet denervation (Tr. 188).  Dr. Wilson also recommended physical therapy and rehabilitation exercises (Tr. 188).

On February 27, 2003, Dr. Wilson performed bilateral lumbar facet injections at L4-5 and L5-S1 on Barger (Tr. 186).  Dr. Wilson noted that "at the time of his discharge, he was reporting better than 50% improvement in his back pain" (Tr. 186).  On March 6, 2003, Dr. Wilson performed radiofrequency facet denervations at the L3, L4, L5, and S1 median branches on the left (Tr. 185).  On March 13, 2003, Dr. Wilson performed radiofrequency facet denervations on the right at the L3, L4, L5, and S1 median branches (Tr. 184).

On April 16, 2003, Barger had a follow-up with Dr. Wilson who noted much improvement in back pain and that Barger "ha[d] no complaints to offer" (Tr. 183). Barger requested a decrease in his pain medication and amitriptyline; Dr. Wilson agreed (Tr. 183).  Dr. Wilson recommended that Barger "return to physical therapy with some strengthening exercises and then possibly a functional capacity evaluation" (Tr. 183).

Between March 3, 2003, and April 17, 2003, Barger attended nineteen physical therapy sessions with therapist Brad Hirl, P.T. (Tr. 153-160).  At the time of discharge, Barger's pain during activity improved, his flexion and extension improved, and his lumbar function improved, while his pain at rest stayed about the same (Tr. 165).  Hirl recommended that Barger continue with the home exercises (Tr. 165).

On June 16, 2003, Dr. Lenz stated that Barger may begin looking for work "but is restricted to no lifting over 10 lbs, no prolonged standing, no bends, stooping, kneeling or squatting" (Tr. 383).

From August 14, 2003 to September 4, 2003, Barger again attended six physical therapy with Brad Hirl, P.T. (Tr. 161).  Hirl worked with Barger on his range of motion, strengthening, and home exercise plan (Tr. 161).  During this time, Barger's pain while

rest and during activity improved slightly (Tr. 161).  His flexion, extension and rotation increased (Tr. 161).

On  September 23, 2003, Dr. Lenz wrote a note excusing Barger from his classes at Western Illinois University until September 29 "for medical necessity" (Tr. 382).

On September 29, 2003, Dr. Lenz wrote a note stating that Barger was not to work until released by himself or Dr. Wilson (Tr. 381).

On September 30, 2003, Barger saw Dr. Wilson for sudden back pain he experienced on September 23, 2003 (Tr. 181).  Dr. Wilson noted, "He had been doing well and was back in school until a little over a week ago when he was reaching for a cup of coffee and in a twisting motion felt sudden onset of low back pain, primarily right sided" (Tr. 181).  He also complained of bilateral groin pain (Tr. 181).  Dr. Wilson prescribed an epidural on the right side and recommended that he continue with OxyContin twice per day, hydorocondone six times per day, amitriptyline at bedtime, Protonix daily, Tricor daily, Atenolol and Tarka daily for his blood pressure, Naproxen twice per day, and Valium as needed (Tr. 181).  Dr. Wilson reduced his amitriptyline due to the "hangover" effect  and prescribed Ambien (Tr. 182).

On October 1, 2003, Dr. Wilson ordered an MRI of the Lumbar Spine (Tr. 179).  Radiologist Dr. Ronald Fuller determined that Barger had "spondylosis and degenerative-disk disease of the lumbar spine at L3-4, L4-5, and L5-S1" (Tr. 179).  He also found signs of annular tearing but "no focal disk protrusions or central canal stenosis" (Tr. 180).

On October 2, 2003, Barger saw Dr. Wilson for an epidural injection and follow-up to the previous day's MRI (Tr. 178).  Dr. Wilson determined that he had "degenerative changes at L3-L4, L4-L5, and L5-S1 with high-intensity zones at L4-L5 and L5-S1.  He also found a "slight bulge" which had contact with the nerve (Tr. 178).

On October 16, 2003, Barger returned to physical therapy with Brad Hirl, P.T. at Mercy Medical Center (Tr. 153).  He attended six sessions between October 16 and

November 6, 2003 (Tr. 153).  During this time, Barger's pain at rest did not improve; it stayed at a "5" on a scale of 10 (Tr. 153).  His pain with activity improved slightly from a "9" out of 10 to an "8/9" out of 10 (Tr. 153).  His flexion and extension also improved slightly (Tr. 153).  The discharge report indicates that Barger discharged himself due to unmet expectations (Tr. 153).

On October 24, 2003, Barger saw Dr. Wilson for a follow-up (Tr. 177).  Dr. Wilson noted that Barger felt some improvement and  that his "function returned more toward normal, although he is continuing to have pain rated in an intensity of 5 to 9 on a scale of 10" (Tr. 177).  Dr. Wilson scheduled a diagnostic lumbar discography "to determine the nature of his pain" (Tr. 177).

On November 7, 2003, Dr. Joseph Phelan, M.D., performed a Computed Tomography ("CT") scan of Barger's lumbar spine (Tr. 172).  Dr. Wilson performed a diagnostic discography (173).  Both the CT scan and discography showed annular tears at the L3-4, L4-5, and L5-S1 (Tr. 172).

On December 8, 2003, Barger saw Dr. Ronny Kafiluddi, an associate of Dr. Wilson's, for a follow-up (Tr. 170).  Dr. Kafiluddi found that at that point, Barger had three options: (1) continue with medical management through the use of pain killers; (2) consult with an orthopedic surgeon about the possibility of surgery; or (3) a three-level nucleoplasty (Tr. 170).  On December 16, 2003, Dr. Kafiluddi performed a bilateral diagnostic medical nerve branch block on Barger to determine what, if any, future treatments would be effective (Tr. 169).

On January 12, 2004, Barger saw Dr. Lenz for a follow-up (Tr. 379).  Dr. Lenz determined that Barger was "no better than last time.  He seem[s] to have plateaued" (Tr. 379).  Barger stated that he was experiencing "intermittent radiation down both legs at various times but no persistent numbness or weakness" (Tr. 379).  Dr. Lenz's physical examination revealed "pretty consistent decreased range of motion" and stiffness and

soreness in the lower back (Tr. 379).  Dr. Lenz recommended that Barger continue with his current regimen of pain killers, which included four hydrocodone per day as well as OxyContin and Elavil at night (Tr. 379).

On February 19, 2004, Dr. Lenz prescribed a Transcutaneous Electrical Nerve Stimulation ("TENS") unit to Barger (Tr. 377).

On April 1, 2004, Barger visited Dr. Lenz because of increased back pain (Tr. 375).  Barger was also "getting some swelling of his lower extremities, they get red and then after that they get blanch slightly and they get cool" (Tr. 375).  Dr. Lenz noted that Barger was having trouble with range of motion exercises because of the pain and thought it might be reflex sympathetic dystrophy (Tr. 375).  Dr. Lenz ordered that he not drive for the next 30 days (Tr. 376).

On April 19, 2004, Barger saw Dr. Lenz for increased swelling in his legs and feet (Tr. 374).  Dr. Lenz stated that overall, he was "really not improving, continuing to worsen.  He continues to have limited range of motion" (Tr. 374).  Dr. Lenz found "he also has evidence of reflex sympathy, sympathetic dystrophy" (Tr. 374). Dr. Lenz also thought he may benefit from surgery (Tr. 374).

On April 26, 2004, Barger returned to Dr. Kafiluddi for a follow-up visit (Tr. 167).  Dr. Kafiluddi noted that he had performed a diagnostic median nerve branch blocks on Barger in December 2003 to determine whether to go ahead with a lumbar radiofrequency neurotomy (Tr. 167).  The procedure revealed that Barger only had about forty percent relief and therefore decided that he "might not benefit from the radiofrequency neurotomy" (Tr. 167).  Dr. Kafiluddi concluded that his options were "either conservative management with physical therapy, lumbar traction, or get an opinion from an orthopedic spine surgeon" (Tr. 167).  Dr. Kafiluddi also thought  he might have Reflex Sympathetic Dystrophy Syndrome ("RSD") (Tr. 167-68).  "[A]t this point he would be at maximum improvement from my standpoint" (Tr. 168).

On May 19, 2004, Barger saw Dr. Lenz for a follow-up, complaining of "a little more pain than usual" (Tr. 206). Dr. Lenz noted that he was doing physical therapy three times per week, which had been helpful (Tr. 206). Barger was having problems with temperature control in his feet. (Tr. 206). He was taking eight hydrocodone per day at this time (Tr. 206). Dr. Lenz recommended that he continue on the same course of hydrocodone, OxyContin, and amitriptyline at night (Tr. 206).

On May 20, 2004, Barger visited Dr. Timothy Millea, M.D., upon referral from Dr. Kafiluddi to determine whether he was a candidate for surgery (Tr. 195). Dr. Millea had "exceptionally low" optimism for the success of a multilevel fusion surgery (Tr. 196). Dr. Millea recommended a radiofrequency ablation procedure, as well as further rehabilitation (Tr. 196). He referred Barger to the in-patient program at the UIHC Spine Center (Tr. 196).

On June 17, 2004, Barger had a follow-up appointment with Dr. Lenz who found that Barger was "doing about the same" and still experiencing "intermittent blanching, redness, temperature changes of his lower extremities" (Tr. 205). Dr. Lenz recommended that he continue to treat the pain with the same medications (Tr. 205).

On July 20, 2004, Barger saw Dr. Lenz, complaining of increased pain (Tr. 204). "[H]is knees also hurt him daily. He is having a lot more muscle spasms" (Tr. 204). Barger also complained of a low mood and difficulty with memory loss and concentration, which was affecting his schoolwork (Tr. 204). The hot and cold changes in his lower extremities continued (Tr. 204). Dr. Lenz found much tightness and tenderness in his back and that his "[r]ange of motion was severely restricted" (Tr. 205). Dr. Lenz determined that he should continue on the same pain medications: four to eight hydrocodone tablets per day; OxyContin and amitriptyline once per day (Tr. 204). He also prescribed Zoloft for Barger's depression (Tr. 204).

On July 30, 2004, Barger had a physical therapy session with Joyce Duey, P.T. (Tr. 372).  He was having difficulty performing exercises due to pain and fatigue (Tr. 372).  On August 2, 2004, Barger had another physical therapy appointment (Tr. 372).  Duey stated that Barger had "very little lumbar flexion in truck flexion" (Tr. 372).

On August 17, 2004, Barger saw Dr. Lenz for a follow-up for his chronic back pain and depression (Tr. 373).  Dr. Lenz's notes indicate that Barger's range of motion improved slightly and that the Zoloft helped him "tremendously" with his schoolwork, particularly his concentration issues (Tr. 373).  Dr. Lenz recommended that Barger continue with Zoloft and pain medications (Tr. 373).

On August 13, 2004, Barger visited the Spine Center at the UIHC where Dr. Joseph Chen, M.D., and Deb Parrott, physical therapist evaluated him (Tr. 256-60).  Dr. Chen and Parrott conducted an assessment of his functional activity and found that Barger was able to lift twenty-five pounds from a deep squat position, twenty-five pounds from ten inches off the floor, twenty-five pounds from waist level to chest level (Tr. 256).  He could push and pull a forty-pound sled twenty feet (Tr. 256).  Barger could tolerate sitting for thirty minutes with support and ten to fifteen minutes without support (Tr. 256).  In sum, Barger had a functional skills rating of seventy-seven percent (Tr. 256).  Dr. Chen recommended that Barger participate in the Center's two-week Spine Rehabilitation Program (Tr. 261).  Dr. Chen believed that Barger was "100% rehabilitatible back to full time, gainful employment in a situation that will not involve a great deal of repetitive lifting, bending, reaching and stooping" (Tr. 261).

From September 7, 2004 to September 17, 2004 Barger attended the outpatient Spinal Rehabilitation Program (Tr. 234-253).  The program included sessions in physical therapy, education about the spine, functional activities restoration, medication management and coping skills (Tr. 230).  According to Physical Therapist Pamela Lee's September 16, 2004 report, by the end of the two-weeks, Barger had increased his

functional capacity in several areas and improved his flexibility and strength overall (Tr. 237).  Barger increased his trunk range of motion in flexion by 67%, his squat lift by 60%, partial squat lift by 60% and arm lift by 40% (Tr. 237).

In a September 17, 2004 letter, Dr. Joseph Chen wrote that Barger would have permanent lifting restrictions of 40-45 pounds and could occasionally lift 20-25 pounds (Tr. 231).  He also stated that Barger was not able to sit for longer than one hour without a one- to two-minute break to stand, move around, change positions and stretch (Tr. 231). Dr. Chen assigned an eight percent Body as a Whole Impairment rating, based on The Guides to the Evaluation of Permanent Impairment (Tr. 231).  Chen specifically recommended that Barger "continue the home exercise program on a regular basis" (Tr. 231).  Chen also made the following assessment of his vocational goals:

> "During the Spine Rehabilitation Program we talked about . . . your plan to return to school, work on your graduate degree and eventually look at either Law School or working as a CPA.  We feel all of this is well within the restrictions that we have outlined."

On October 25, 2004, Barger returned to the University of Iowa Spine Center for a follow-up with Dr. Chen (Tr. 225).  Dr. Chen treated Barger for diarrhea and abdominal pain related to withdrawal from his narcotics.  (Tr. 225).  Dr. Chen noted that Barger's back pain was worsening (Tr. 225).  Dr. Chen restarted Zoloft and amitriptyline for his sleeping problems (Tr. 225).

On November 3, 2004, Barger had a follow-up at the Iowa Spine Center, where he saw psychologist Dr. Valerie Keffala, social worker Ted Wernimont, and physical therapist Pamela Lee (Tr. 223-24).  Barger was "doing very well" in regards to his back pain but was still suffering from gastrointestinal problems associated with his narcotic withdrawal (Tr. 223).

On December 7, 2004, Barger saw Dr. Lenz, who wrote that Barger was doing "fairly well" with the back pain (Tr. 415).

On February 2, 2005, Barger also saw Dr. Chen for a follow-up to the Spine Rehabilitation Program (Tr. 360). Barger's range of motion was twenty-six percent less than when he left the program and he had a thirty-three percent decrease in extension (Tr. 362). Dr. Chen recommended walking three to five times per day for five to fifteen minutes to improve both his physical and mental health (Tr. 363). He also increased Barger's antidepressant, Zoloft, and recommended that he continue using amitriptyline for sleeping (Tr. 360).

On May 4, 2005, Barger had his six-month follow-up at the Spine Rehabilitation Program with Dr. Chen. (Tr. 357). Dr. Chen evaluated both his physical health and physical therapy development (Tr. 355-358). He noted that Barger exhibited signs of situational depression (Tr. 355). Dr. Chen stated that Barger's difficulty with narcotics tapering had recently improved (Tr. 355). Dr. Chen evaluated his functional mobility, noting a 10% increase in flexion, a slight increase in range of motion and a 50% increase in extension (Tr. 357).

On August 2, 2005, Barger had a follow-up with Dr. Chen and Dr. A. Elizabeth Rippentrop, psychiatrist (Tr. 353). Dr. Rippentrop noted that Barger stated that his pain was "tremendous" and that he was very fatigued and had trouble concentrating (Tr. 353). The doctors recommended that Barger re-enter the spine rehabilitation program to get him back on-track (Tr. 353-354). "Had Mr. Barger not had to deal with a difficult drug withdrawal period, he likely would have been able to continue an active program of rehabilitation" (Tr. 354).

From August 8-19, 2005, Barger attended the two-week Spine Rehabilitation Program (Tr. 324-252). At the end of the program, on August 19, 2005, Dr. Chen

12

evaluated Barger, concluding that "we would anticipate a gradual return to prior levels of activity, although using moderation will be a key point." (Tr. 324). He determined that Barger would be able to "eventually . . . return to full time work" (Tr. 324). In a letter to Barger dated August 26, 2005, Dr. Chen recommended that Barger return to school (Tr. 386). "Vocationally, you are finally able to move forward with full time classed [sic] this fall. As a team we continue to have no doubt that you will be able to return to full time gainful employment with in [sic] the lifting restrictions we have outlined above" (Tr. 386). Dr. Chen recommended no more than one-time lifts of forty pounds and repetitive lifts of than twenty pounds (Tr. 386). He assigned an impairment rating of only eight percent (Tr. 387).

On November 8, 2005, Barger saw Dr. Lenz for a follow-up to hypertension, hyperlipidemia and a "recent flare of his low back pain" (Tr. 402). Dr. Lenz recommended that Barger continue with Tarka and Atenolol for hypertension; Lopid for hyperlipidemia; physical therapy for his lower back pain; and amitriptyline at bedtime (Tr. 402). He recommended that Barger begin to wean-off of Zoloft and developed a weaning schedule (Tr. 402).

### B.  Plaintiff's Subjective Complaints

On October 16, 2003, Barger filled out a Personal Pain/Fatigue Questionnaire (Tr. 83). Barger stated that he had "sharp, radiating pain which is centrally located in center of lower back, which spreads to the left and right of the spine" (Tr. 83). He had pain radiating down to the groin area and through both legs (Tr. 83). He stated that when the pain penetrates, "it is like a sharp knife in the center of my back" (Tr. 83-84). He stated that his pain was continuous in a twelve-hour day and worsens with activity, i.e., "walking, standing, stooping, bending, twisting, lifting anything over 10 lbs." (Tr. 83). He was only able to get a full night of sleep when he took Ambien (Tr. 87).

13

Barger noted that the pain worsened on September 23, 2003 (Tr. 85).  "I felt sharp pain in the center of my back, which weakened my legs and lowered me to the ground. For 2 days following, I was unable to walk without assistance and was put on bed rest until 9/26/03" (Tr. 85).  Due to the pain, Barger had "been unable to attend my classes on a regular basis.  I have had to take incompletes at school and finish my semester courses with extensions . . . ." (Tr. 85).  He noted that he had recently dropped one of his accounting courses and that his "homework gets farther behind each day" (Tr. 86).  The pain also affected his parenting; Barger stated that he was unable to "do the normal day-to-day activities with my children" (Tr. 86).  "I can not lift or carry my littlest child when she needs me to" (Tr. 86).

On April 23, 2004, Barger filed a Reconsideration Disability Report (Tr. 92-95). In the report, he stated that he had developed RSD (Tr. 92).  He wrote that his pain level was usually a eight or nine out of ten (Tr. 92).  He increased his pain medication from 20 mg of OxyContin twice a day to 40 mg twice per day and went from six to eight Hydrocodone per day (Tr. 92).  He noted that he had been using a TENS unit for about two months (Tr. 92).  Barger stated that he was unable to sit more than 15-20 minutes and stand for more than 10-15 minutes (Tr. 92).  He could not lift more than twenty pounds (Tr. 92).  Barger stated that he only showers about twice a week due to pain and needed assistance putting on his clothes (Tr. 94).

On June 8, 2004, Barger completed a Pain/Fatigue Questionnaire (Tr. 99-107).  He reported a "sharp and radiating" pain in his lower back and pain radiating to the front groin area and down his legs (Tr. 99).  He stated that on severe days he has muscle spasms (Tr. 99).  Movement, including "walking, standing, twisting, stooping, lifting over 10 lbs," exacerbated the pain (Tr. 99).  The pain increased after sitting for 30-45 minutes or standing for 10-15 minutes (Tr. 99).  He stated that he felt pain "7 days a week, continuously each and every day" (Tr. 99).  He rated his average pain as a seven on a

scale of one to ten (Tr. 100).   He noted that at that time, he was taking 40 mg of OxyContin twice per day and two 50-mg tablets of four times per day (Tr. 102).   Barger noted that the pain medications gave him "shakes, irritability, mood swings, nausea, short-term memory," as well as drowsiness and weakness (Tr. 102).

His average day included going to class if he felt well, otherwise his professors would e-mail him the class notes (Tr. 106).   He stated that he can only drive in-town due to his shakiness (Tr. 106).   He "occasionally tr[ied] to cook with the kids for something to do" (Tr. 106).   His wife and children did most of the household chores (Tr. 106).

On June 8, 2004, Barger filled out a Daily Activities Questionnaire (Tr. 108).   He indicated that he rarely bathes, shower, shaves, or performs hair care (Tr. 108).   "When dressing I have to wear slip on shoes because of the trouble of bending" (Tr. 108).   He stated that he sleeps three to four hours per night (Tr. 108).   He gets up during the night and sits in a recliner (Tr. 108).   He stated that he prepares meals about once a week that are "usually very simple" with help from his children (Tr. 109).   He did not do any of the shopping but would occasionally go the store with his wife "to get out of the house" (Tr. 109).   He drove "only when absolutely necessary," such as when no one else was available to pick up his children (Tr. 109).   He was not engage in any of his hobbies because of his injury (Tr. 110).   He indicated that he had difficulty going out in public (Tr. 110).

On June 30, 2004, Barger filed a Disability Report Appeal (Tr. 112-118).   He reported that since his last disability, he stopped attending school due to the pain and fatigue, which "causes me to have more trouble retaining and studying the material for my classes" (Tr. 116).   He also attributed left school because he had difficulty traveling to class (Tr. 116).

On January 28, 2005, Barger filed a disability report (Tr. 123-130). He stated that his disability made him unable to stand or sit for long periods of time, and that it limited his motion, twisting, and bending (Tr. 124).

### C. Residual Functional Capacity

In an August 9, 2002 letter, Dr. Timothy Miller affirmed a functional capacity evaluation done at the Work Hardening Center (Tr. 371). The letter stated that Barger is able to lift up to twenty pounds at shoulder level, ten pounds overhead, and push up to twenty pounds occasionally (Tr. 371). Restrictions include not spending more than "10% of his shift squatting, crouching, kneeling, crawling, balancing, and climbing" (Tr. 371). Not more than 33% of his shift should be spent "[r]eaching over head, climbing, and sitting" (Tr. 371). The restrictions put him at a sedentary- light level restriction (Tr. 371). Dr. Miller noted that the report indicates that Barger exerted "submaximal effort" during his evaluation (Tr. 371). He believed that Barger had been exaggerating his symptoms and severity of pain (Tr. 371). "[I]t is my personal belief that this patient is capable of more than [a sedentary light level of work] and at least functioning at a light lifting with 20 to 30 pound lifting being an option for him" (Tr. 371).

On June 2-3, 2003, Barger participated in an Isernhagen Functional Capacity Evaluation at the Work Fitness Center in Bettendorf, Iowa (Tr. 392-95). The report states that Barger had discomfort in his lower back during the testing "due to weakness of lumbar paraspinals and quadriceps" (Tr. 393). Barger also had cardiovascular difficulty with the testing (Tr. 393). Physical therapist Jill Piatu found that Barger could both sit and stand for 34-66% of the day (Tr. 394). Barger was able to crawl most of the day, crouch and repetitively squat for 34-66% of the day, and kneel for 6-33% of the day (Tr. 394). Piatu determined that Barger could lift from floor to waist 35 pounds 1-5% of an eight-hour day; 25 pounds 6-33% of the day; 15 pounds 34-66% of the day and 10 pounds 67% or more of the day (Tr. 394). Barger could lift 40 pounds overhead 1-5% of an eight-hour day; 25

16

pounds 6-33% of the day; 15 pounds 34-66% of the day and 10 pounds over 67% of the day (Tr. 394).

On March 12, 2004, Dr. J.D. Wilson, M.D., a non-examining, non-treating agency physician, performed a Physical Residual Functional Capacity Assessment (Tr. 197-202). He found that Barger could occasionally carry ten pounds, stand and/or walk for at least two hours in a normal eight-hour workday, sit for six hours in an eight-hour workday, and push and pull an unlimited amount. Dr. Wilson determined that Barger could occasionally climb, stoop, kneel, crouch, and crawl, but was unable to balance. "His reports of needing to move around every 15-20 minutes due to pain is not consistent with his ability to drive to school 4x a week which is approximately a 45 minute drive. The claimant continues to attend school and reports that his attendance and grades are adequate" (Tr. 199). Dr. Wilson found that Barger would need to move around about every 45 minutes, which could "easily be accommodate[d] within the workstation environment" (Tr. 199). The RFC was affirmed by Claude Koons on June 14, 2004.

On May 4, 2004, Wade Lenz, M.D., performed a Lumbar Spine Residual Functional Capacity Examination (Tr. 190-93). Dr. Lenz found that Barger could frequently lift less than ten pounds and rarely lift over ten pounds. He would never be able to scoop, crouch or climb ladders and could rarely twist or climb stairs. Barger could sit for at least six hours per day and stand/walk less than two hours per day. He could only sit for 15 minutes at one time and stand for 10 minutes. Barger needed to walk approximately every 30 minutes during an eight-hour shift, for five minutes at a time. Dr. Lenz determined that Barger would need a job that would permit shifting from sitting to standing and accommodate unscheduled breaks. Dr. Lenz estimated Barger would be absent from work an average of four days per month.

On February 7, 2005, Dr. Arthur E. Schmidt, M.D., completed a Physical Medical Source Statement (Tr. 266-68). Dr. Schmidt found that Barger can sit for up to six hours

17

during an eight-hour day, for no longer than thirty minutes at a time (Tr. 266).  Barger could occasionally lift 26-50 pounds and frequently lift and carry up to 25 pounds (Tr. 266).  Barger would frequently be able to bend, crawl, climb, and occasionally squat and reach (Tr. 267).

### D.  Hearing Testimony

ALJ Wampler held Barger's hearing on November 16, 2005.  At the time of the hearing, Barger was 41 years-old.  Vocational expert George Paprocki testified.

Barger testified that he fell at work on October 28, 2001.  He  worked part-time from that date until April 2002 and had not worked since then.  He stated that he worked about thirty-five hours per week before the accident and twenty hours per week from the time of the accident to April 2002 (Tr. 422).  Barger's attorney than requested to modify the onset date from October 28, 2001 to April 30, 2002 (Tr. 422).

At the time of the hearing, Barger testified that he was a senior at Western Illinois University, studying accountancy and minoring in finance (Tr. 422).  His course load over the previous two years was between twelve and fifteen hours (Tr. 423).  He testified that he previously had difficulty studying due to his pain medications (Tr. 423).  He stated:

> "[M]y wife called me a vegetable.  I couldn't remember what I was reading.  I ended up having to drop out of school.  After taking an incomplete for over a year, in one class that I was no [sic] able to finish, they finally ended up sending me to the Iowa Spine Center Rehab for two weeks of—I was—they were weaning me down on the medication at that time.  After I got out of there, they stopped the medication, and I went through a series of withdraws for a long—for quite a few months."

(Tr. 424).

At the time of the hearing, Barger testified that he used mind-control techniques that he learned during rehabilitation to control the pain, and supplemented that with Tylenol.

He was also taking amitriptyline at night, but had not been sleeping as well since coming off the painkillers (Tr. 425). Barger testified that he was also taking Zoloft, Prevacid for gastrointestinal problems, Tarka for high blood pressure and Atenolol (Tr. 434).

Barger testified that he had difficulty sitting for long periods of time. "I have to stand up after probably about 15 . . . ten or 15, maybe 20 minutes" (Tr. 426). He stated that he sits in the back of the classroom so that he can stand up without disturbing his classmates. He can stand for between fifteen and thirty minutes. "[R]ight now it's right around 20 minutes where it really starts to tighten up, and the pain starts to increase" (Tr. 427). He also stated that he has to lay down two or three times per day while studying and more frequently when on OxyCondone (Tr. 428).

The ALJ asked Barger what effect going off OxyCodone in September 2005 had on his ability to focus and concentrate. Barger replied that his concentration and memory had improved but that his grades "still are not where they were" (Tr. 429).

Barger testified that he had worked several restaurant jobs prior to his injury, usually in managerial positions such as an assistant manager, general manager, or trainer. He then described the requirements for each of the jobs. The restaurant jobs required a lot of time on his feet. He had to lift cases of meat which weighed sixty to eighty pounds. In his employment as a semi driver, he usually sat and drove for periods of five hours at a time (Tr. 430). He would often have to load and unload the truck. One company required him to stop and load ten to fifteen times per day. The loads were usually 100 to 200 pounds (Tr. 431).

Barger testified that he tried but was not able to return to any of his previous jobs between April 2002 and the time of the hearing. "After April of '02, the doctors told me that I didn't–I should concentrate on the schooling and change careers because my back would not hold up" (Tr. 432).

The ALJ asked how he planned to have a career in accounting with his physical restrictions.  Barger said that he planned either to find a firm that accommodated his needs or to open his own business (Tr. 432).

When asked what he does around the house, Barger testified that "tr[ied] to keep the house as organized as possible" and "tr[ied] to get the dishes done," but would often use paper plates (Tr. 433).  He said his daughters cook and his wife does the grocery shopping.  His daughters and wife do the laundry.  (Tr. 433).

Vocational expert George Paprocki then testified that all of Barger's previous jobs had been considered "heavy" work.  Paprocki found that Barger could transfer his skills to several different "light" and "sedentary" jobs (Tr. 435).  He first suggested that Barger could be a short-order cook, of which there were 2,600 positions in Iowa and about 100,000 nationally (Tr. 435).  He could be a lunch cook, of which there were 11,000 jobs in Iowa, 370,000 jobs nationally.  Paprocki also testified that based on Barger's level of education, he could do be a receptionist, of which there were 10,000 receptionist jobs in Iowa and 500,000 nationally.  He could also work as a timekeeper, a sedentary position, with 1,500 jobs state-wide and 80,000 jobs nationally.  Last, Paprocki opined that Barger could do statistical work, which is also sedentary.  There are 2,500 jobs state-wide and 150,000 jobs nationally.

Barger's attorney then questioned Paprocki about the available work based on the following hypothetical:

> "The individual would frequently experience pain severe enough to interfere with attention and concentration . . . . He would be able to sit 15 minutes at one time, could walk zero city blocks with rest or severe pain, could stand for ten minutes at one time before needing to sit down or walk around . . . could stand and walk for less than two hours in an eight-hour day with normal breaks, but who could sit at least six hours in an eight-hour day.  The individual would need to take

> unscheduled breaks during an eight-hour working day with
> unspecific frequency or length, who would use–who would be
> required to use a cane or other assistive device, doing
> occasional standing and walking, who could frequently lift less
> than ten pounds, rarely lift ten pound–rarely is defined as one-
> percent to five-percent of the eight-hour day–and who can
> never lift over that, who can never stoop, or bend, or crouch,
> or climb ladders, and who would . . . be absent about four
> days per month."

(Tr. 436-37).   Paprocki responded that Barger would be unable to work with those
restrictions.  "Four days per month of absenteeism is probably at least double what would
be something that the normal employer would be able to accommodate" (Tr. 437).  He also
thought that the frequency of pain would interfere with concentration.

Barger's attorney then modified the hypothetical:

> "Let's assume . . . he would be missing about four days a
> month.  Let's assume he could be there every day.  Let's
> assume that he would not need to take any unscheduled breaks
> during the day, and let's assume . . . it looks like he can sit at
> least six so at least he could do the sitting cumulatively per day
> of the sedentary work as defined.  And let's assume also that
> he didn't have to change position every ten to 15 minutes from
> that primarily seated type of work.  My question is this, is
> given that all of the jobs that you indicated he could do, or
> skilled or semi-skilled work, how important is that restriction
> on the frequent experience of pain severe enough to interfere
> with attention and concentration in the context of non-
> unskilled, i.e., skilled or unskilled work?"

(Tr. 439).  Paprocki responded that "[h]e would have to be able to concentrate on the task
at hand on a rather ongoing basis regardless of what the work involved" (Tr. 439).

## IV.  CONCLUSIONS OF LAW

### A.  Scope of Review

In order for the court to affirm the ALJ's findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole.  See Lochner v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989).  Substantial evidence is more than a mere scintilla.  It means relevant evidence a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1997); Cruse, 867 F.2d at 1184; Taylor v. Bowen, 805 F.2d 329, 331 (8th Cir. 1986).  The court must take into account evidence that fairly detracts from the ALJ's findings.  Cruse, 867 F.2d at 1184; Hall v. Bowen, 830 F.2d 906, 911 (8th Cir. 1987).  Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence."  Cruse, 867 F.2d at 1184 (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)).  The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence.  Gunnels v. Bowen, 867 F.2d 1121, 1124 (8th Cir. 1989); Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

### B.  ALJ's Disability Determination

Determining whether a claimant is disabled involves a five-step evaluation.  See 20 C.F.R. § 404.1520(a)–(f); Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The five steps are:

(1)  If the claimant is engaged in substantial gainful activity, disability benefits are denied.

(2)  If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe.  If the impairment is

22

not severe, benefits are denied.

(3)     If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.

(4)     If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past. If the claimant is able to perform her previous work, she is not disabled.

(5)     If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

Trenary v. Bowen, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990) (citing Yuckert, 482 U.S. at 140–42); 20 C.F.R. § 404.1520(a)–(f)).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he is unable to perform his past relevant work." Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995) (citing Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education and work experience. Id.

At the first step, the ALJ found that Barger had not engaged in substantial gainful activity since his alleged onset date (Tr. 17). At the second step, the ALJ determined that Barger had a severe impairment (Tr. 22). The ALJ did not state what that impairment was, but found that "medical evidence establishes that the claimant has a 'severe'

23

impairment or combination of impairments" (Tr. 22).  Barger argues that the ALJ erred when he failed to enunciate which impairments he considered severed.  This argument will be addressed in Part IV.F below.

At the third step, the ALJ determined that Barger's impairments did not meet or equal one of the listed impairments (Tr. 19). At the fourth step, the ALJ determined that Barger was unable to perform his past relevant work (Tr. 21). At the fifth step, the ALJ found that Barger could transfer acquired skills to perform jobs in the economy and therefore is not disabled (Tr. 21).

### C.  Subjective Complaints of Pain

Barger argues that the ALJ failed to evaluate his subjective complaints of pain in considering whether he was disabled.  Barger argues that the ALJ (1) did not cite Polaski v. Heckler in his credibility analysis; and (2) did not discuss the factors necessary for a credibility analysis.

This court requires the ALJ to utilize a full credibility analysis according to the dictates of Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). This analysis requires the following:

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>> 1. the claimant's daily activities;
>> 2. the duration, frequency and intensity of the pain;
>> 3. precipitating and aggravating factors;
>> 4. dosage, effectiveness and side effects of medication;
>> 5. functional restrictions.

Id.  This court has previously noted that "an ALJ is free to doubt a claimant's subjective

pain complaints.  However, he must support a denial of benefits based on a consideration of the above-mentioned five factors."  Barry v. Shalala, 885 F. Supp. 1224, 1242 (N.D. Iowa 1995).  Where an ALJ seriously considers but for good reasons explicitly discredits a plaintiff's subjective complaints, the court will not disturb the ALJ's credibility determination.  Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).

Here, the ALJ did not cite Polaski but evaluated Barger's credibility based on factors identical to those in Polaski.  The ALJ wrote:

> "The Administrative Law Judge gave careful consideration to evidence supporting such matters as (1) the nature, location, onset, duration, frequency, radiation, and intensity of pair or other symptoms; (2) Precipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) Type, dosage, effectiveness, and adverse side-effects of medication; (4) Other treatment for relief of pain and other symptoms; (5) Functional restrictions; (6) the claimant's daily activities; and (7) All other relevant evidence [20 C.F.R. § 404.1529]."

(Tr. 20).  While it is the preferred practice cite Polaski explicitly, it is sufficient to analyze a claimant's credibility in a similar manner.  Instead of citing to Polaski, the ALJ referenced 20 C.F.R. § 404.1529, which is a codification of the Polaski factors and therefore meets the commands of Polaski.  See Schultz v. Astrue, 479 F.3d 979, 982 (8th Cir.2007) ("Although the ALJ never expressly cited Polaski (which is our preferred practice), the ALJ cited and conducted an analysis pursuant to 20 C.F.R. §§ 404.1529 and 416.929, which largely mirror the Polaski factors.").

The ALJ correctly acknowledged and analyzed the above factors.  The ALJ discussed the nature of Barger's fall that caused his back pain.  He stated the fact that Barger was going to school since the time of the onset date and that his school made accommodations for his injury.  The ALJ discussed which medications that Barger was

using, which at the time of the hearing was only Tylenol.  He also noted that Barger used "mind control" to deal with the pain.  The ALJ stated that Barger testified that he had difficulties "sitting, standing, and pushing" (Tr. 20).  He discussed Barger's daily activities.  The ALJ concluded that Barger was not credible, noting that he did not seem to have any of the physical changes consistent with "medically severe intractable pain," i.e., "aging, weight loss, impaired gait . . . progressive physical deterioration"(Tr. 20).  The ALJ also found that according to his own testimony, Barger engaged in activities inconsistent with disabling pain: he drove, attended college courses, and was able to work part-time after the time of the injury (Tr. 20).  The Court finds that the ALJ sufficiently addressed Barger's subjective complaints and highlighted inconsistencies.  <u>See</u> <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 590 (8th Cir. 2004) (internal citations omitted); <u>Masterson v. Barnhart</u>, 363 F.3d 731, 738 ("The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject plaintiff's complaints.").  The Court will therefore defer to the ALJ's credibility analysis as he is in the best position to analyze a claimant's credibility.  <u>See</u> <u>Johnson</u>, 240 F.3d at 1147-48.

### D.  Treating Physician

Barger argues that the ALJ failed to give reasons for disregarding the opinion of Barger's treating physician, Dr. Wade Lenz.  He argues that Dr. Lenz's opinions are supported by consistent, objective evidence in the record and medically accepted diagnostic techniques and literature.

The Commissioner responds that the ALJ properly considered Dr. Lenz's opinions but  rejected them, relying instead on the "substantial evidence indicating Plaintiff was capable of performing a full range of light work" (Def. Brief, p. 7).  The Commissioner points to statements by Dr. Joseph Chen at the UIHC.  Dr. Chen twice wrote that he was confident that Barger would be able to return to gainful employment.    Additional

evidence, the Commissioner argues, includes the fact that Barger was going to school throughout the course of his injury and graduated from Clinton Community College with a 4.0 grade-point average. Last, the Commissioner argues that Dr. Arthur Schmidt, a non-treating agency physician, found that Barger "could sit six hours at one time, lifting 25 pounds frequently and 50 pounds occasionally" (Def. Brief, p. 8). The Commissioner argues that this constitutes substantial, conflicting evidence to discredit Dr. Lenz's opinion.

> "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."

Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citation omitted). The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician. See 20 C.F.R. § 404.1527(d)(2). Whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight. Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). Moreover, a treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement. Piepgras v. Chater, 76 F.3d 223, 236 (8th Cir. 1996); see also Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991) (holding that the weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements).

While there is little discussion of Dr. Lenz's opinions,[2] the record contains ample evidence of inconsistencies, particularly between Dr. Lenz's opinion and other physicians' opinions. Where two or more treating physician's opinions conflict, it is the ALJ's duty to resolve the inconsistencies. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1219 (8th Cir. 2001) ("It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians."). One such conflicting opinion was that of Dr. Chen at the UIHC Iowa Spine Center, who was both a treating physician and specialist. In August 2005, after Barger completed the Spine Rehabilitation Program for the second time, Dr. Chen wrote to Barger, "we [the spinal rehabilitation team] continue to have no doubt that you will be able to return to full time gainful employment with in [sic] the lifting restrictions we have outlined" (Tr. 386). Dr. Chen noted that Barger was no longer taking any narcotics and was confident that Barger could use the skills that he learned in the Spine Rehabilitation Program to manage his pain. Dr. Chen also recommended that Barger return to school. Dr. Chen wrote that Barger was able to do one-time lifts of forty pounds and repetitive lifts of no more than twenty pounds (Tr. 386). He assigned an impairment rating of eight percent (Tr. 387).

The restrictions Dr. Chen outlined are consistent with the ALJ's light-level restriction. Conversely, Dr. Lenz found that Barger could only rarely lift over ten pounds, could not stand or walk for more than two hours per day and would be absent an average of four days per month. The VE testified that absenteeism of four days per month would be intolerable to the normal employer (Tr. 437).

In resolving this conflict between Dr. Chen and Dr. Lenz's opinions, the ALJ rightfully credited Dr. Chen's opinion. First, Dr. Chen is a spine rehabilitation specialist; Dr. Lenz is not a specialist. <u>See</u> 20 C.F.R. § 404.1527(d)(5) ("We generally give more

---

[2]The ALJ's total discussion of Dr. Lenz's opinion was: "In May 2004, a treating doctor completed a residual functional capacity assessment in which the claimant was found capable of a limited range of sedentary work" (Tr. 18).

weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Second, Dr. Chen assessed Barger's residual functional capacity more recently than Dr. Lenz. Further, Dr. Chen assessed Barger's abilities after he attended the intense two-week Spine Rehabilitation Program where Barger learned new physical and psychological strategies for dealing with his pain. See Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) ("Impairments that are controllable or amenable to treatment do not support a finding of total disability."). This was a drastic change in Barger's treatment plan. Barger had weaned off of all narcotics, which had made him groggy and affected his memory and concentration. In contrast, Dr. Lenz conducted his Residual Functional Capacity evaluation before he entered the rehabilitation program. It was therefore appropriate to give Dr. Chen's assessment more weight because of its timeliness, as well as the fact that he was both a treating physician and specialist.

The opinions of two other physicians are also inconsistent with Dr. Lenz's assessment. In an August 9, 2002 letter, Dr. Timothy Miller affirmed a functional capacity evaluation that gave Barger a sedentary to light level restriction (Tr. 371). He stated, however, that he felt that Barger was capable of light work and of lifting 20 to 30 pounds (Tr. 371). He believed that Barger gave a "submaximal effort" and exaggerated his symptoms (Tr. 371).

Dr. Arthur Schmidt, a non-treating, non-examining physician completed a Physical Medical Source Statement that was also inconsistent with Dr. Lenz's opinion (Tr. 266-68). While the opinions of non-treating, non-examining doctors do not alone constitute substantial weight, the ALJ must evaluate all medical opinions. See 20 C.F.R. § 416.927(d) (2001). Dr. Schmidt found that Barger could perform at a light level of work. He determined that Barger could sit for six hours at a time, bend, crawl, and climb frequently, and squat and reach occasionally (Tr. 267). Dr. Schmidt also found that

Barger could occasionally lift 26-50 pounds and frequently lift and carry 21-25 pounds (Tr. 266).

Last, the ALJ noted that throughout the course of his injury, Barger attended college classes, first at Clinton Community College and then Western Illinois University (Tr. 20). He graduated from with high honors from Clinton Community College in June 2003 with 4.0 grade-point average, also earning a community leadership award (Tr. 295). See Tennant v. Apfel, 224 F.3d 269, 271 (8th Cir 2000) (finding part-time college attendance inconsistent with disabling pain). The ALJ also noted that Barger drove (Tr. 20). It took Barger forty-five minutes to drive to school, a drive he would do four times per week (Tr. 199). Together, the Court finds substantial evidence in the record as a whole that is inconsistent with Dr. Lenz's assessments. It was not improper for the ALJ to refuse to give Dr. Lenz's opinion controlling weight.

### E.  Residual Functional Capacity

Barger argues that the ALJ's decision regarding his Residual Functional Capacity ("RFC") assessment was not supported by substantial medical evidence. As such, Barger asserts that the ALJ presented an improper hypothetical to the VE.

The ALJ found that Barger could perform light work (Tr. 20, 22). Barger argues that it is contrary to several medical opinions. Dr. J.D. Wilson found that Barger was only able to stand for two hours per eight-hour day (Tr. 197-202). In a June 3, 2003 functional capacity evaluation at the Work Fitness Center, physical therapist Jill Piatu found that Barger was not able to stand or sit for a full eight-hour workday. On May 4, 2004, Dr. Lenz, a treating physician, concluded that Barger could stand for less than two hours per day (Tr. 190-93). Barger also notes that Dr. Miller affirmed a 2002 RFC that found that Barger could perform sedentary to light work. Barger contends that these medical opinions are inconsistent with the ALJ's determination that he could perform a full range of light work because it "requires the ability to stand for at least 6 hours in an 8-hour day" (Pl.

Brief, pg. 34).

The Commissioner counters that the ALJ's RFC assessment was supported by substantial evidence, specifically, the opinions of Drs. Chen, Schmidt and Miller. As discussed in Part IV.D, Dr. Chen found that Barger "would be able to perform gainful employment once he completed his college education" (Def. Br. 7). Dr. Schmidt, a non-treating agency physician, found that Barger could sit for six hours at a time, bend, crawl, and climb frequently, and squat and reach occasionally. The Commissioner argues that while Dr. Miller affirmed a sedentary-light work level, he believed that Barger had given "submaximal effort" and exaggerated his symptoms (Def. Br. 10). Dr. Miller opined that Barger could probably work beyond a sedentary-light level. Last, the Commissioner asserts that Barger "vastly improved" in physical therapy (Def. Br. 10). Together, the Commissioner argues that there was substantial medical evidence on which the ALJ could base his RFC assessment.

Determining a claimant's residual functional capacity is a medical question. Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). "The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." McGivney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). However, the record "must include some medical evidence that supports the ALJ's residual functional capacity finding." Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (citing Anderson, 51 F.3d at 779); Lauer, 245 F.3d at 704 (noting that while the ALJ was not "limited to considering medical evidence," the ALJ was "required to consider at least some supporting evidence from a professional."). "The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). Among treating

physicians, specialists are entitled to greater weight when giving an opinion related to their specialty. See Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995); 20 C.F.R. § 415.927.

Viewing the record as a whole, the Court concludes that the ALJ's RFC was supported by substantial medical evidence. As discussed in Part IV.D, the medical opinions of Drs. Chen and Miller, both treating physicians, and Dr. Schmidt, a non-treating physician, all support the ALJ's RFC. Additionally, the record shows that Barger vastly improved after going through rehabilitation at the UIHC Spine Center. There, Barger learned many methods of rehabilitation, including physical therapy, aerobic exercise, and psychological therapy (Tr. 326-28). Dr. Chen was confident that if Barger continued these exercises, he would return to prior levels of activity within functional limitations (Tr. 324).

The Court finds substantial medical evidence in the record to support the ALJ's RFC. Accordingly, the ALJ did not present an improper hypothetical to the VE.

### F.  Severe Impairment

Barger argues that the ALJ failed to state which of Barger's impairments were severe. Barger requests that the Court remand the case to determine which impairment, or combination of impairments, is severe. The Commissioner responds that the ALJ is not required to state which impairment he or she considers severe.

The Court finds it unnecessary to remand for a determination of Barger's severe impairment. While the ALJ did not explicitly state which impairment he considers severe,[3] he discussed at length Barger's many doctor visits, diagnostic examinations, and physical therapy sessions related to his back pain (Tr. 17-19). The ALJ's opinion shows that Barger has a clear history of chronic lumbar pain. His pain was such that at times he was

---

[3]The ALJ stated, "The medical evidence establishes that the claimant has a 'severe' impairment or combination of impairments" (Tr. 22).

taking three heavy pain medications and high doses of them.[4]  The record indicates that the course of treatment for his back pain lasted at least four years.  He consulted numerous physicians regarding his back problems, including specialists.[5]  He sought physical therapy for his back at both Mercy Medical Center and at the UIHC Spine Center.  (Tr. 153-166; 214-262; 324-369)

Barger contends that he also suffered from gastrointestinal problems and high blood pressure during this time and therefore it is necessary for the ALJ to state with precision which of his impairments he considered severe.  While the record indicates that Barger suffered from gastrointestinal problems following his withdrawal from narcotic pain medications, they were a side-effect of his lower back problems.  These problems did not persist; they improved after several months (Tr. 353).  Further, nothing in the record shows that his high blood pressure was the cause of his functional restrictions.  His physicians were able to control his high blood pressure with medication (Tr. 409, 411).

The Court finds that the record supports the ALJ's finding of a severe impairment, which was severe lower lumbar pain.  The ALJ's failure to state with precision Barger's severe impairment does not merit remand.

---

[4]Records from a January 12, 2004 visit to Dr. Lenz indicate that Barger was taking four hydrocodone per day, OxyContin and amitriptyline (Tr. 379).  By May of 2004, Barger was taking eight hydrocodone per day, along with OxyContin and amitriptyline (Tr. 206).  He began tapering his narcotic pain medications shortly before he entered the Spine Rehabilitation Program at the UIHC in August 2004 (Tr. 261).  At the time he began tapering, he was taking six hydrocodone per day, OxyContin twice per day, and amitriptyline and Ambien for sleep.  (Tr. 259).

[5]Barger consulted several specialists regarding his lumbar back pain, including Drs. Kevin Wilson and Ronny Kafiluddi, orthopedic doctors (Tr. 167-188); Dr. Ernest Found, a surgical spine specialist (Tr. 366-370; and Dr. Joseph Chen, a spine rehabilitation specialist (Tr. 212-262; 324-369).

Upon the foregoing,

**IT IS ORDERED** that the decision of the Commissioner of Social Security is hereby affirmed.   This matter is dismissed.   The Clerk of Court shall enter judgment accordingly.

**DATED** this 24th day of September, 2007.

JOHN A. JARVEY
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF IOWA